(Decided June 29th, 1860.)

---

# THE NORTHERN CENTRAL COMPANY *vs.* MARY ANN SCHOLL, Adm'x of ELIAS SCHOLL.

A ticket-agent of the Northern Central Railway Company, a Maryland corporation, sold a ticket, in Pennsylvania, to a negro, *after notice that*

*he was a runaway slave,* entitling him to pass over a portion of its road in that State, whereby his escape from service was facilitated. HELD:

1st. That this was a *tort* for which the master of the slave, a citizen of Maryland, may recover the value of the slave, in a Maryland court, against the railway company.

2nd. It makes no difference that the act was committed without the limits of Maryland, and in the State of Pennsylvania, by whose laws *slavery* is not recognized.

3rd. Nor is the jurisdiction of such a *tort* vested, by the Act of Congress of 1850, ch. 60, *exclusively* in the District court of the United States for Pennsylvania; the 7th section of that Act allowing the recovery of damages in certain cases, does not touch the question of the *value* of the *escaped slave.*

4th. Nor is it essential to the plaintiff's recovery, that he should prove that the loss of the slave was attributable *wholly* to his being transported on the defendant's road, from one place to another, in Pennsylvania; if the defendant *aided* him in his escape, it matters not who assisted in it.

A personal *tort,* committed against a citizen of Marryland, in another State, may be redressed by action against the wrong-doer, in the courts of Maryland, whenever he comes within its limits.

In all actions for injuries, *ex-delicto* to the person, or to personal property, the venue is, in general, transitory, and may be laid in any county, though committed out of the jurisdiction of the court or out of the State.

The right of property of the citizens of Maryland in their negro slaves, is recognized by the Constitution of the United States, which is the supreme law of the country.

Whilst it is competent to Pennsylvania, or any other State, to prohibit negro slavery within its borders, yet, it is beyond its power to authorize its inhabitants, or others, to assist in despoiling the citizens of Maryland of their property in slaves.

A State may, if it pleases, forbid its courts to grant redress for such a wrong, but it cannot oust the jurisdiction of the courts of the State of the injured party; whenever the wrong-doer comes within its limits, he is liable to be made answerable for his tortious acts.

Though slavery be not established by the laws of Pennsylvania, it is recognized, and its protection guaranteed by the Constitution of the United States, and a railway company in that State has no more right, knowingly, to assist in the escape of a runaway slave than a wagoner on the high road.

By an agreement between the defendant and another railroad company, the defendant was *to appoint* an agent, whose duty it was to receive and collect freight, to sell all passengers tickets, and to receive the revenues accruing from the joint operations of the two companies. HELD:

Northern Central Railway Co. *vs.* Scholl's adm'x.

That by this agreement there is no partition of the agency as to the sales of *through tickets* over both roads; the defendant is responsible for the manner in which this agent discharges his duty in the sale of such tickets.

APPEAL from the Superior Court for Baltimore City.

This action was brought on the 11th of July 1855, by the appellee's intestate, against the appellant, to recover the value of a slave for life, named Solomon Digges, belonging to the plaintiff, and alleged to have been lost to him by being transported in the cars over the railway of the defendant.

*Exception.* The pleadings and evidence are sufficiently stated in the opinion of this court. After all the evidence had been offered on both sides, the plaintiff asked the following instruction to the jury:

That if the jury shall find, from the evidence in the cause, that the defendant by arrangement with the Hanover Branch Railroad Company, had the authority to appoint an agent for the sale of passenger tickets, from Hanover to Baltimore, York, Harrisburgh and Columbia, and that the defendant in pursuance of such arrangement, and by virtue of such authority, had, prior to May 1855, appointed the witness, Leib, such agent, and that Leib, during May 1855, acted as such agent, and sold tickets for the passage of persons holding them from Hanover to said point, or points, named in said tickets respectively, and that on the morning of the 28th of May 1855, Leib, as such agent, sold and delivered to the negro man, Solomon Digges, spoken of by the witnesses Epply and Barrick, a ticket to pass on the said Hanover Branch Railroad to the place called the Junction, and thence in the cars of the defendant to York, and that in virtue of said ticket, the said negro man did travel over the said railroad from Hanover to the Junction, and thence on the railroad of the defendant from the Junction to York; and shall further find, from the evidence, that said slave was a valuable slave, and that he became and was wholly lost to the intestate of the plaintiff, and is wholly lost to his estate and to the plaintiff; and shall further find that the said agent, before the cars

334        MARYLAND REPORTS.

Northern Central Railway Co. vs. Scholl's adm'x.

started, was notified that the said negro man was a slave and had run away from his master in Frederick county, and that said agent, notwithstanding said notice did not forbid or prohibit the said negro man from keeping in the cars with said ticket, and did not take any steps, nor make any effort to prevent the said negro man from going on in said cars, or to get back said ticket, or to prevent the escape of said negro, then the conduct of said agent was wrongful and negligent, and the defendant is responsible to the plaintiff for such damages, if any, as the jury may find, from the evidence, the plaintiff's intestate sustained by reason of such conduct.

The defendant then asked the following instructions:

1st. That the defendant is a common carrier of passengers, and bound to carry in its cars all persons entitled to be so carried, upon tendering the defendant the fare prescribed by law, and complying with such reasonable regulations as the defendant may prescribe, and that it is responsible in damages for a refusal to carry any such persons on those terms.

2nd. That by the true construction of the contract between the defendant and the Hanover Branch Railroad Company, offered in evidence by the plaintiff, the agent mentioned in the third article thereof, though to be appointed by the defendant, was, as to sales of through tickets made by him, the agent of the Hanover company, so far as said tickets authorized a passage over the road and in the cars of said Hanover company, and under the division made by the fifth article of the fare received by him at Hanover for through passenger tickets, the portion thereof payable to the defendant was for the transportation of passengers by the defendant over its own road, and not for the transportation over the road of the said Hanover company; and if the jury shall find, from the evidence, that Mr. Leib was appointed by the defendant as agent, under the said third article and accepted said appointment, and while acting as such agent, sold to Solomon Digges, the slave of the plaintiff's intestate, (if they shall find him to have been the slave of the said intestate,) at Hanover, under said agreement, a through ticket from Hanover to York, and that by virtue thereof he was entitled

to a passage in the cars of the said Hanover company, and propelled by its motive power upon the said Hanover company's said road, from Hanover to the junction of the said Hanover company's road, with the road of the defendant, and thence in the cars of the defendant, and propelled by its motive power and over its railway to York; and that the defendant and the said Hanover company are not one but different companies, and own and use, and did then own and use, separate roads, cars and motive power, then that the defendant is not liable for the sale of said through ticket so far as it respected the transportation of the said slave on the said Hanover company's road, or for the transportation of said slave upon the said last mentioned road.

3rd. If the jury shall find that the defendant was formed, and constituted a corporation in 1854, under the Act of Assembly of Pennsylvania of 1854, No. 531, (which has been offered in evidence by consent,) and the Act of Assembly of Maryland of 1854, ch. 250, upon the terms and conditions contained in the written agreement for that purpose offered in evidence by consent, and entered into by the Baltimore & Susquehanna Rail Road Company, and the other parties thereto, and that a full record and report thereof was certified by the president of said company, and transmitted to the Governors of Maryland and Pennsylvania; and if they shall further find, from the evidence, that Solomon Digges was the slave of the plaintiff's intestate, and that the said slave bought a passage ticket for transportation by the defendant on its cars upon its railway, as stated by the plaintiff's witnesses, then the plaintiff is not entitled to recover in this action under the Act of 1838, ch. 375, *provided,* the jury shall find from the evidence that the said sale of the said ticket was made in Pennsylvania, and that the part of the defendant's railway upon which the said slave so procured a ticket for transportation, and was transported, was within the State of Pennsylvania.

4th. If the jury shall find from the evidence, that Solomon Digges was the slave of the plaintiff's intestate, and that the said slave bought a passage ticket for transportation, and was

transported, in the defendant's cars upon its railway, and that the defendant, and the person selling said ticket on the defendant's behalf, to said slave, received no other notice or information that the said Solomon Digges was a fugitive, except what was communicated to said agent by the plaintiff's witness, Epply; and if they shall further find from the evidence that slavery did not exist in Pennsylvania at the time of such sale and transportation, except as to fugitive slaves, and that said Solomon Digges was a fugitive slave and had escaped from his master in Maryland, at the time of such sale and transportation, and that said sale and transportation took place in Pennsylvania, and that the said Epply was not authorized by the master of the said slave to seize and arrest said slave, and was not assisting the master or any agent or attorney of said master, and that said sale and transportation were made openly and in good faith, and not to prevent the discovery and arrest of said slave, then, that the sale of said ticket, and the transportation of the slave, under the circumstances above mentioned, was not, nor was either of them, a violation of the rights of the plaintiff's intestate, as to such fugitive slave, secured to him by the Constitution and laws of the United States, and the plaintiff is not entitled to recover.

5th. If the jury shall find from the evidence that Solomon Digges was a slave of the plaintiff's intestate, and had actually escaped out of the State of Maryland, before he purchased a passage ticket at Hanover, or was conveyed in the defendant's cars upon its railway, as testified to by the plaintiff's witnesses; and if they shall further find from the evidence that the said slave was taken on said cars in Pennsylvania, and carried on the defendant's railway, from one point to another, in that State, and that he left said cars and railway, in that State, then, that the plaintiff is not entitled to recover the value of said slave, unless they shall also find from the evidence that the loss of said slave was attributable wholly to his being so transported from one place to another, in Pennsylvania, and that but for said transportation he would not have been lost to the plaintiff.

6th. If the jury shall find from the evidence that Solomon

Northern Central Railway Co. *vs.* Scholl's adm'x.

Digges was the slave of the plaintiff's intestate, and that he escaped, from his master, into Pennsylvania, and bought a passage ticket in Pennsylvania, and was transported upon the defendant's railway in Pennsylvania; and if they shall further find from the evidence, that, at the time of said sale and transportation, there was no fact within the knowledge of the defendant, or its agent, to warrant the presumption that said Solomon Digges was a slave, but his color, and that, by the laws of Pennsylvania, in force at the time, every person of color was presumed to be free, that then the plaintiff is not entitled to recover.

7th. If the jury shall find, from the evidence, that Solomon Digges was the slave of the plaintiff's intestate, and escaped into Pennsylvania, and, after such escape, bought a passage ticket there and was transported in the defendant's car upon its railway in that State, as testified to by the plaintiff's witnesses; and if they shall further find from the evidence that the defendant received, anterior to said purchase or transportation, no notice, and had no knowledge that the purchaser of said ticket, and the person so transported, was a fugitive slave, except what was given by the plaintiff's witness, Epply, to the ticket agent at Hanover as testified to by him; and if they shall further find, from the evidence, that the said ticket agent at Hanover, had no authority from the defendant to sell passage tickets over any part of its road to any person whom he might reasonably suspect to be a fugitive slave, and that said ticket agent, knowing, or having reasonable grounds for suspecting, that said Solomon was a fugitive slave, sold him a passage ticket, by virtue of which he was transported, as stated by the witnesses, upon the defendant's railway in Pennsylvania, with intent, knowingly and wilfully, to aid said slave in his escape from his master, and that said slave was thereby lost to his master, then that the plaintiff is not entitled to recover.

8th. In estimating the value to be allowed to the plaintiff for his slave, if the jury shall find for the plaintiff, the jury must take into consideration the fact, that at the time when said slave purchased a ticket for transportation, and was trans-

ported in the defendant's cars, he was a fugitive in a free State, and allow the value of said slave accordingly.

9th. That this court has no jurisdiction of the *tort* alleged to have been committed by the defendant, as the same is detailed in the plaintiff's evidence, and that the plaintiff is not entitled to recover, if the jury find from the evidence that slavery does not exist in Pennsylvania, except as to fugitive slaves, because the jurisdiction of said *tort* is vested, by the Act of Congress, of 1850, ch. 60, exclusively in the District Court of the United States for Pennsylvania, within whose jurisdiction the said alleged *tort* was committed.

The court (LEE, J.) rejected the plaintiff's prayer, granted the *first, third, sixth, seventh, eighth,* and rejected the *second, fourth, fifth* and *ninth,* prayers of the defendant, and the defendant excepted to the refusal to grant its prayers which were rejected. The verdict was in favor of the plaintiff for $813.40, damages and costs, and from the judgment thereon the defendant appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and TUCK, J.

*Daniel M. Thomas* and *J. Mason Campbell,* for the appellant:

1st. The second prayer is based upon the construction of the contract between the defendant and the Hanover Branch Railroad Company, and asks an instruction to the jury, that by the proper construction of that contract, no partnership was created between the two companies, and that unless they found a partnership, the one company was not responsible for the acts of the other. That the arrangement between the two companies, respecting the sale of through tickets and the appointment of one ticket agent for both, did not constitute a partnership between them, is well settled by authority. *Redfield on Railways,* 282, 349, 350. 19 *Barb.,* 222, 237, 238, *Briggs vs. Vanderbilt.* 26 *Ala.,* 736, *Ellsworth vs. Tartt.* 2 *Pet.,* 150, *Boyce*

*vs. Anderson.* 4 *Richardson,* 160, *Sill vs. South Caro lina Rail Road Company.* And if there was no partnership, the correctness of the latter part of the prayer— "that the defendant is not liable *for the sale of said through ticket,* so far as it respected the transportation of the said slave on the said Hanover company's road, *or for the transportation* of said slave upon the said last mentioned road"— follows as a matter of course. The mere sale of the ticket worked no injury to the owner of the slave, *unless the slave actually exercised the right which the ticket gave him.* The injury was, his transportation beyond the reach of the master. If, notwithstanding his purchase of the ticket, he had not entered the cars of either company, then no wrong was done to the owner of either company, by the sale of the ticket. And if, with the ticket, he was only transported over the road of the Hanover company, that company alone was responsible for such transportation. Now, if this be so, and if the evidence of the transportation over the defendant's road was merely presumptive, (as was the case, for no witness testified to seeing him enter the cars of the defendant, or even that he went as far as the Hanover Junction,) then the jury were at liberty to find the fact of such transportation or not; and it was proper, therefore, that they should be instructed that unless they did find it, the plaintiff was not entitled to recover. The refusal of this prayer could only be justified on the theory that the Hanover company was *the agent* of the defendant; and when we search the record for the evidence of such agency, we find there is none whatever, *unless* the appointment of one agent to act for both, in *the sale of tickets,* constituted each company, as to every thing respecting the carriage of passengers, the agent of the other.

2nd. The principle asserted by the fourth prayer is, that in Pennsylvania the rights of the slave owner, in respect to fugitive slaves, exists only in virtue of the Constitution of the United States and the Acts of Congress upon that subject; and that the only wrongs in violation of such rights committed in that State, for which he can claim legal redress, are those defined by the Acts of Congress. And if this prin-

ciple be correct, the plaintiff's case does not come within the scope of the Acts of Congress, and, therefore, does not constitute in her any right of action. The State of Pennsylvania, so far as her laws can make her so, is a free State, in which the slave holder, in respect to his slave property, has no rights whatever. The Pennsylvania Act of 1780, ch. 68, after providing for the emancipation of all slaves from and after the passage of the Act, on their serving till the age of twenty-eight years, and requiring the registry before the 1st day of November 1780, of the names of all slaves who were such at the time of the passage of the Act, enacts: "That no man or woman of any nation or color, except the negroes or mulattoes, who shall be registered as aforesaid, shall at any time hereafter be deemed, adjudged or holden within the territories of this commonwealth, as slaves or servants for life, but as free men and free women." Their Bill of Rights, adopted in 1838, asserts the broad principle, "that all men are born equally free and independent." And the Supreme Court of that State, in an action for harboring a runaway slave, and aiding him to escape, has decided that Pennsylvania, since the passage of the Act of 1780, is a free State; and that the principles of the common law do not sustain any such action there. 10 *Barr.*, 514, 516, 519, *Kauffman vs. Oliver.* The Act of March 3rd, 1847, goes still further, and prohibits the State courts, and State officers, from rendering any assistance in the arrest and recovery of fugitive slaves, and inflicts a punishment upon the master who shall arrest his slave and carry him away againt his will. This being the state of the law in Pennsylvania, it must be remembered that the Northern Central Railway Company, so far as its operations are conducted within the limits of the State of Pennsylvania, is a Pennsylvania Corporation, subject to Pennsylvania laws. The original charter (Act of 1827, ch. 72) of the Baltimore and Susquehanna Railroad Company, (the only one of the consolidated companies whose road lies in Maryland,) provides, by sec. 12, that its by-laws shall not be contrary to the laws of any of the States assenting to that Act, and sec. 23 makes the provisions of the Act to be wholly

in force after the organization of the company, as to all the property of the company, *"which may be situated or may be within the State of Maryland."* And the Maryland consolidation Act, of 1854, ch. 250, sec. 1, provides, secondly: "That all laws heretofore made in reference to the said Baltimore and Susquehanna Railroad Company, and not repealed or modified by the Legislature of Maryland, and all ordinances relating to said company heretofore made and not repealed by the Mayor and City Council of Baltimore, shall be binding and operative upon said consolidated company, *so far as its operations may be within the jurisdiction of the State of Maryland,* or the city of Baltimore respectively, and so far as the said laws or ordinances may be applicable to, and consistent with, the new organization of the said consolidated company." And the Pennsylvania Act of consolidation, of 1854, No. 531, sec. 1, provides as follows: *"Second,* that all Acts of the General Assembly of Pennsylvania, heretofore made and not repealed or modified, relating to either of the said companies, shall be binding upon the said consolidated company, *so far as its property or its operations may be within the jurisdiction of this State."* By this it appears, that by the consolidation of these several companies by the States of Maryland and Pennsylvania, neither State intended to extend its laws where they did not reach before. But the design of each State was to retain the operation of its own laws upon so much of the consolidated road as lay within such State. And as the part of the road over which this slave was carried, if carried at all, by the defendant, lay entirely within the State of Pennsylvania, this case must be governed entirely by the laws of Pennsylvania, *except in so far* as these laws are controlled and modified by the Constitution and laws of the United States. That the defendant is not a Maryland corporation, as to its operations conducted in Pennsylvania, is shown not only by the legislation above referred to, but also by the cases *State vs. Boston, Concord & Montreal Rail Road Co.,* 25 *Verm.,* 442, and *Runyan vs. Coster's lessee,* 14 *Pet.,* 129. When a corporation acts by agent in another State, his acts must be tested by the law of

the State where he acts. 13 *Pet.*, 589, 588, *Bank of Augusta vs. Earle.* 9 *Pet.*, 607, 627, *Owings vs. Hall.* The charter is *a contract,* and in its construction it is necessary to look to the place *where it is to be performed.* 2 *H. & J.*, 228, *De Sobry vs. De Laistre.* 6 *Pet.*, 203, *Cox & Dick vs. The United States.* 4 *Johns*, 288, *Thompson vs. Ketcham.* 2 *Burr.*, 1078, *Robinson vs. Bland.* It makes no difference that this case is tried in a Maryland *forum.* The rule is, that the *lex fori* applies as *to the remedy,* but the *lex loci contractus* as to the right. 3 *G. & J.*, 234, *Trasher vs. Everhart.* Now the act complained of in this case was committed in Pennsylvania, where slavery does not exist, and where the rights of the slave owner are not only not respected, but all the administrative powers of the State are withheld from him when seeking to regain his slaves. Apart, therefore, from the remedy provided by the Constitution and laws of the United States, there would be no redress for injuries of the sort complained of in this action. 2 *Barn. & Cress.*, 448, 462, *Forbes vs. Cochrane.* 16 *Pet.*, 611, *Prigg vs. Commonwealth of Pennsylvania.* 2 *McLean*, 601, *Jones vs. Vanzandt.* 6 *Amer. Law Reg.*, 439, *Rodney vs. Illinois Central Rail Road Co.* But if the action can only be maintained under the Acts of Congress, it cannot be maintained at all. In order to bring the case within the scope of these Acts, it must be shown that the defendant was guilty of *"harboring and concealing"* the slave, *"after notice"* that he was a fugitive from labor. *Acts of Congress of* 1793, *ch.* 7, *sec.* 4, and 1850, *ch.* 60, *secs.* 6, 7. But the defendant did not receive the notice required by these Acts. 1 *Amer. Law Reg.*, 149, *Oliver vs. Kauffman.* 5 *How.*, 225, *Jones vs. Vanzandt,* and same case in 2 *McLean*, 607. 2 *Barn. & Cress.*, 458, *Forbes vs. Cochrane.* And the selling the ticket was not *"harboring and concealing,"* within the meaning of these Acts, as the same authorities show. Therefore this case is not one of those for which Congress has provided a remedy. And even apart from this view of the case, the court erred in refusing to grant this prayer, because,

in effect, it only asked the court to instruct the jury, that if they found that the ticket agent *acted fairly and in good faith,* in the sale of the ticket, the plaintiff was not entitled to recover. The color of the negroes raised no suspicion in Pennsylvania of their being slaves, but, on the contrary, they were to be presumed to be free. And the ticket agent might very well, *in good faith,* have declined to act upon the unauthorized statement of a mere stranger—as Mr. Epply admits he was—in view of the fact that, as common carriers, these roads were bound to carry the negroes, unless they were believed to be slaves. *Story on Bailments, sec.* 591. 1 *Parsons on Cont.,* 696. *Redfield on Railways,* 261, 262. An action at common law, for harboring servants, required actual notice that they were servants. 6 *Term Rep.,* 221, *Blake vs. Lanyon.* 2 *Barn. & Cress.,* 458, *Forbes vs. Cochrane.* Even in South Carolina it has been held, that the act must be negligent and *without knowledge* of the owner of the slave not consenting to it. 4 *Richardson,* 156, *Sill vs. South Carolina Rail Road Co.* And in Maryland, before the Act of 1838, ch. 375, negligence, actual or constructive, was required. 6 *G. & J.,* 291, *Steam Nav. Co. vs. Hungerford.*

3rd. The fifth prayer required the court to instruct the jury that the plaintiff was not entitled to recover, unless they believed that the act complained of was the efficient cause of the slave being lost to his owner. The slave, at the time of the transportation by means of the ticket purchased by him at Hanover, had already effected his escape. If he had remained in Hanover, or if he had gone thence by some other way, *non constat* that his master would ever have recovered him. In fact, the evidence of Mr. Epply shows that it is very probable he would not. And the jury were at liberty to find one way or the other. It was very proper, therefore, that they should be instructed, that the mere fact of his being carried by the defendant from one part of Pennsylvania to another, was no ground for the plaintiff's recovery, unless they also found that it was in consequence of his being so

carried that his recovery was prevented.  1 *Greenlf. on Ev.,* secs., 256, 261.

4th. The ninth prayer is based upon and is a conclusion drawn from, the position contended for by the appellant in regard to the fourth prayer. If the appellee's right of recovery is derived from and given to him by the Constitution of the United States and the Acts of Congress, then the Federal courts are the proper tribunals in which to have these laws administered. 10 *Barr.*, 514, *Kauffman vs. Oliver.* 6 *Amer. Law Reg.*, 441, *Rodney vs. Illinois Central Rail Road Co.*

The appellant therefore contends, that the judgment of the court below ought to be reversed, if this court shall be of opinion, either:

1st. That the defendant ought not to be held liable for the acts of the Hanover Branch Company.

2nd. Or that the appellee's right to recover must depend upon the Constitution and laws of the United States.

3rd. Or that a sale of the ticket, by the ticket agent at Hanover, in good faith, and without being satisfied that the person purchasing it was a slave, constituted no ground of recovery.

4th. Or that the sale of the ticket, or transportation of the slave, worked no injury to the owner, *unless* the escape was caused thereby.

5th. Or that the federal courts alone had jurisdiction of the controversy.

*Wm. Schley,* for the appellee, argued:

1st. The second prayer of the appellant was properly rejected. The ticket agent at Hanover, in making sale of a *through ticket,* acted as an agent of the defendant, and such is the true construction and effect of the third article of the contract between the companies. He was not merely an agent *pro rata intineris,* as this prayer asserts. But if he was only an agent *pro tanto,* the distinction makes no difference, inasmuch as the prayer concedes that the slave passed over the defendant's road, from the Hanover Junction to

York, by virtue of the *same ticket*, which enabled him to travel as far as the Junction in the cars of the Hanover Branch company. Now the agreement shows, that the issue of such tickets was within the scope of the authority of the agent, whose appointment was conferred by the defendant. The ticket faciliated the escape. See, for illustration, *Arnold vs. Cost*, 3 *G. & J.*, 233. The selling of the ticket was a *tort*, and the doctrine of *contract*, in reference to separate companies selling through tickets, has no application to this case.

2nd. The fourth prayer was properly refused. The notice given by Epply, if found by the jury, was sufficient, at least, to impose the duty of withholding the ticket until further inquiry. Even if the inference might otherwise have been made, from the refusal of this prayer, that the court intended to ascribe a legal effect to the notice, *per se*, independently of its influence on the mind of the agent, the granting of the defendant's sixth prayer excluded any such inference. But, in support of the refusal of the prayer, I respectfully insist that it was the duty of the defendant to have made reasonable regulations in this behalf, and that it was gross negligence, under the circumstances, to have permitted these negroes to receive tickets, and travel in the cars. 6 *G. & J.*, 291, *Steam Nav. Co. vs. Hungerford.* 2 *H. & G.*, 182, *Ferguson vs. Tucker.* 2 *Halsted*, 253, *Gibbons vs. Morse.* 2 *McLean*, 604, *Jones vs. Vanzandt*, and same case in 5 *How.*, 215. 4 *Richardson*, 154, *Sill vs. South Carolina Rail Road Co.* 6 *Term Rep.*, 221, *Blake vs. Lanyon.* 1 *B. Monroe*, 292, *Johnson & Co. vs. Bryan.* The laws of Pennsylvania prohibit slavery only so far as its own people are concerned. Under the Constitution of the United States, the laws of that State cannot interfere with fugitive slaves from other States. A slave does not become free by running away into a free State, nor are the *rights* of the slave owner over him lost by such act. See 5 *How.*, 230, 231, and the *Dred Scott Case.* The slave in this case, being a slave in Maryland, was a slave in Pennsylvania,—nothing altered his *status*. If, in Pennsylvania, a suit had been brought in *trover* for this slave, and the courts and jury had enforced

the law, the master could have recovered. Unless the Constitution and laws of the United States are to yield to those of Pennsylvania, the *wrong* done there is just as much a wrong as if done in Maryland.

3rd. The fifth prayer was properly rejected. Any unwarranted dealing with the slave was unlawful and entitled the owner to sue in *trover*. A wrong-doer has no right to throw upon the injured party the *onus* of establishing that the injury was *wholly* the result of his act. If it contributed to produce the injury there was actual damage *pro tanto*, and even legal damage would sustain the action. 1 *Chitty's Pl.*, 140, 141, 154. 7 *H. & J.*, 60, *Cromwell vs. Owings.* 2 *H. & J.*, 347, *Hay vs. Conner.* 9 *Gill*, 12, *Hacker vs. Dement.*

4th. The ninth prayer was properly rejected, and was unwarranted by the Act of Congress to which it refers. The action in this case is an action of *trover*, grounded upon the common law alone, and is not brought under our Act of 1838, ch. 375, nor under the Act of Congress. The act complained of was the selling of the ticket to this slave, which was an unwarranted dealing with the property of the plaintiff, entitling him to bring the action of *trover* therefor at common law. The cases already cited abundantly establish this position. The Act of Congress gives a special remedy in certain specified cases and forms of action, but it does not oust the jurisdiction of the ordinary tribunals. A party may sue a defendant for a *tort* done any where, whenever he can catch him in the State, and within the jurisdiction of our courts. He may sue him in the ordinary way, and before the ordinary tribunals, for a wrongful act done in another State.

LE GRAND, C. J., delivered the opinion of this court.

This suit was brought by the intestate of the appellee against the appellant, to recover the value of a slave for life, belonging to said intestate, and lost to him, by being transported in the cars over the railway of the appellant. The declaration contains two counts; the first of which alleges,

that the appellant transported said slave in its cars, whereby he was enabled to escape, and did escape, and was wholly lost to the plaintiff; the second count was in *trover*. The plea was, not guilty, on which issue was joined. It was agreed that all errors in pleading should be released; and, also, that all statutes of Maryland and of Pennsylvania might be read from the printed statutes of those States.

Proof was given, at the trial, of the ownership and value of the slave, and that the slave was last seen at the home of his master, in Frederick county, Maryland, on the evening of Whitsunday of 1855; and that he was next seen on Whitmonday, in Hanover, Pennsylvania, by a Mr. Epply, in company with two other slaves, who had also run away, at the same time, from the same neighborhood in Frederick county. At the time Mr. Epply saw them, all three slaves were in the ticket office of the Hanover Branch Railroad; and one of the other slaves had applied for, and had obtained, a ticket for Little York, Pa. The agent of the railroad then inquired of the slave to whom he had sold a ticket, whether the others wanted tickets also. Being answered in the affirmative, the agent proceeded to prepare for the last mentioned slaves, two tickets, and whilst so employed, Mr. Epply asked him, "How he came to give those boys tickets, not knowing whether they had permits, or were free or slaves?" He replid, "That it was not his business to enquire," and added, "that if a black man called for a ticket, and paid for it, he had as good a right to a seat in the first class cars as any other man." Epply told the agent that the boys were runaways and that he wanted to arrest them. It was *after* this notice, given by Epply,—according to his testimony,—that the ticket was given to the slave of the intestate of the appellee. Mr. Lieb, the agent, testifies the ticket was sold *before* the notice was given to him. The ticket purchased by the slave was a through ticket to York, by which he was entitled to travel over the appellant's road. There is no direct evidence how far the slave travelled on either the Hanover or the appellant's road; he was never heard of after the starting of the cars from Hanover. Evidence was given of articles of agree-

ment entered into on the 12th day of April 1855, between the Northern Central Railroad Company and the Hanover Branch Railroad Company. By the third article of the agreement, the Northern Central Company was to provide an agent, whose duty should be, "to forward and deliver all tonnage at Hanover, to receive and collect the freight thereon, to sell all passenger tickets, and to receive the revenue therefrom accruing from the joint operations of the two companies."

The plaintiff offered one prayer, which was refused; and the defendant nine prayers, of which, the *first, third, sixth, seventh* and *eighth* were granted, and the *second, fourth, fifth* and *ninth* were rejected.

When the instructions which were given to the jury at the request of the defendant are duly considered, to entitle it to a reversal of the judgment rendered against it, one of two proposition must be made out to the satisfaction of this court. Either, that as the sale of the ticket, and the transportation of the slave, took place within the limits of the State of Pennsylvania, and without those of the State of Maryland, there can be no recovery for the escape of the slave, *because* slavery is not recognized in Pennsylvania; or, that the jurisdiction of the alleged *tort* is vested, by the Act of Congress of 1850, chapter 60, *exclusively* in the District Court of the United States *for Pennsylvania*, within whose jurisdiction the said alleged *tort* was committed.

All the other propositions, contended for by the appellant, it had the benefit of, in the directions given by the court. Indeed, instructions were given to the jury which, in our opinion, were not authorized by the law of the case. In granting the sixth prayer of the defendant, the court gave it every possible advantage; it told the jury if they were of the opinion the slave had escaped from his master into Pennsylvania, and at the time of the sale of the ticket to, and the transportation of, the slave, there was no fact within the knowledge of the defendant, or its agent, to warrant the presumption that the negro was a slave but his color, then the plaintiff could not recover. This direction gave it every advantage to be desired from want of knowledge on the part

of the defendant and its agent, and from the laws of Pennsylvania, which do not recognize slavery in negroes. The second prayer of the defendant was properly rejected for the reason, if for none other, that it does not give a proper construction to the articles of agreement between the Hanover road and the defendant. It makes the agent, *"as to all sales of through* tickets made by him, the agent of the Hanover Company, so far as said tickets authorized a passage over the road and in the cars of said Hanover Company." The articles of agreement make no such partition of the agency; all that it provided for, is, the partition of the proceeds of sale, &c., between the companies. The appointment of the agent is with the defendant, and it alone must be held responsible for the manner in which its appointee discharges his duty. The fourth prayer was also properly rejected; it, in point of fact, denied the sufficiency of the information derived from Mr. Epply, to put the agent on the inquiry whether or not the negro was a slave. If the jury believed the testimony of Epply, nothing, except the title papers to the negro, could have been more specific and positive than were his declarations to the agent, or better calculated to awaken the caution of the latter. The fifth prayer makes it incumbent upon the plaintiff to establish, to the satisfaction of the jury, that the loss of the slave was attributable, *wholly*, to his being transported from one place to another in Pennsylvania, and that but for such transportation he would not have been lost to the plaintiff. This prayer, if granted, was well calculated to mislead the jury. It is quite possible that had the negro not gone over the railroad that he may have escaped in another direction. That which is complained of is not the passiveness of the defendant, but its active co-operation in facilitating the escape of the slave. By the sale of the ticket he was permitted to travel over the road; and after he had qualified himself by the possession of the ticket to travel, he escaped by the means which it afforded him to do so. There is no evidence whatever in the case, going to show, that he made his escape through any other instrumentality than that of passing over the road of the defendant. If the defendant

aided him in his escape from service, it matters not who as-sisted in it, the defendant would still be responsible. The ninth prayer asserts the proposition, that inasmuch as slavery does not exist in Pennsylvania, except as to fugitive slaves, and because of the provisions of the Act of Congress of 1850, chapter 60, the jurisdiction of the *tort* complained of is vested in the District Court of the United States for Penn-sylvania.

There is no doubt that it is with the courts of Pennsyl-vania to determine, whether or not they will enforce the laws of Maryland on the subject of negro slavery. The whole matter rests in comity, and, in extending it in any particular case, a foreign tribunal always gives due weight and influ-ence to the spirit and policy of its own institutions. But this case calls for no application of the principle of comity. It is not an appeal to the courts of Pennsylvania, but one by a citizen of Maryland to the courts of his own State.

There is nothing in the Act of Congress of 1850, chapter 60, confining the jurisdiction of *torts*, like the present, to the federal courts. The seventh section of the Act, which al-lows damages to the amount of one thousand dollars in cer-tain cases, and which confers jurisdiction on the District courts in action of debt, does not touch the question of value of the escaped slave; that is left where it was previously. Nor, is there anything in the principles of the common law which ousts the jurisdiction of the courts of Maryland, in cases of personal *tort* committed without its limits. Ever since the celebrated case of *Mostyn vs. Fabrigas, Cowper,* 161, it has been uniformly held, both in England and this country, that personal *torts*, committed against a subject of Great Britain, or a citizen of the United States, in a foreign country, may be redressed by action against the wrong-doer, in the courts of England, or the State courts of the United States. In the case referred to Lord Mansfield suggested a doubt, whether the jurisdiction would exist where neither of the parties were subjects of Great Britain, and the injury was done without the realm; and this doubt, after a very full and able argument, was resolved, on principles of public

policy, in the negative, in the case of *Malony vs. Dows*, reported in *Abbott's Reports of Practice Cases*, 316. It was there determined, that the courts of one State or country have no jurisdiction of actions *between citizens* of another State, for damages for purely personal *torts* committed within the jurisdiction of another State. There, the plaintiff and defendant had been citizens of the State of California, and the false imprisonment and other wrongs complained of were committed in that State. The court, in New York, whilst recognizing the doctrine of the decision in *Mostyn vs. Fabrigas*, nevertheless held, that, whether or not it took jurisdiction of a case between citizens of another State, for a wrong done in such other State, was a question to be settled in the discretion of the court, according to what might appear to be the best policy and most conducive to the general good; holding, in the particular case, California, and not New York, to be the proper place where the matter should be investigated and adjudicated. This is a transitory action, and the venue may be laid in any county of the State. *Robinson & wife, vs. Armstrong*, 34 *Maine*, 145. In all actions for injuries, *ex-delicto*, to the person, or to personal property, the venue is in general transitory, and may be laid in any county, though committed out of the jurisdiction of the court, or out of the King's dominions. 1 *Chitty's Pleadings*, 269, *marginal*, (*Ed. of* 1851.)

In the case before the court, the plaintiff is a citizen of Maryland, and his right of property in his negro slaves is recognized by the Constitution of the United States, which is the supreme law of the country; and whilst it is perfectly competent to Pennsylvania, or any other State, to prohibit within its borders, negro or any other kind of slavery of the person, yet, it is beyond its power to authorize its inhabitants, or others, to assist in despoiling its neighbors of their property in slaves. It may, if it pleases, forbid its courts to grant redress for the wrong, but it cannot oust the jurisdiction of the courts of the State of the injured party. Whenever the wrong-doer comes within its limits, he is liable to be made answerable for his tortious acts.

Considering that the defendant had the benefit of every instruction it was entitled to, and that the evidence was sufficient to authorize the jury in finding as they did, we see no reason why the judgment should be disturbed. Although slavery be not established by the laws of Pennsylvania, it is recognized, and its protection guaranteed, by the Constitution of the United States; and a railroad company, in Pennsylvania, has no more right, knowingly, to assist in the escape of a runaway slave, than a wagoner on the high road.

*Judgment affirmed.*

(Decided July 11th, 1860.)